OPINION
{¶ 1} Appellants Matthew Keylor ("Matthew") and Michaelann Young Keylor ("Michaelann") are appealing the judgment of the Monroe County Court of Common Pleas, Juvenile Division, which terminated their custody rights over their minor children, Elijah and Gabriel Keylor. The court awarded custody to the paternal grandparents, Appellees Jack and Donna Keylor, after finding that Michaelann was incapable of caring for the children and was an unfit parent, using the criteria established in In rePerales (1977), 52 Ohio St.2d 89, 369 N.E.2d 1047. The record reflects that Michaelann had primary custody of the children. She had a bipolar psychological disorder, but this appeared to be under control at the time of the custody hearing. It appears that Michaelann and Matthew engaged in violent arguments, but that Michaelann was a good mother to the children apart from those violent episodes with her husband. Matthew made it clear that he did not want to have custody, and that he fully supported Michaelann's right to custody. It is not clear from the record whether the trial court fully considered if Michaelann could have retained custody as long as she had no contact with Matthew, or at least no contact in the presence of the children. Given the extreme gravity of the trial court's judgment (including an order that Michaelann and Matthew would only be allowed minimal supervised visitation), this matter must be remanded for the trial court to determine whether Michaelann, individually, may retain custody of her two boys.
 {¶ 2} Appellants are the biological parents of Gabriel M. Keylor, d.o.b. 12/26/1997, and Elijah M. Keylor, d.o.b. 12/5/1999. Appellees are the biological parents of Matthew, and are the paternal grandparents of Gabriel and Elijah.
 {¶ 3} Michaelann is the primary caregiver and has had custody of Gabriel and Elijah from birth. Matthew is not presently living in the home. Michaelann has a daughter named Emily residing with her, and has a son named Samuel who resides with Michaelann's parents. Matthew is not the biological parent of Emily or Samuel.
 {¶ 4} On February 17, 2000, Appellees were granted visitation and companionship rights with the children. At the time of this order, Michaelann and Matthew were not married.
 {¶ 5} On March 20, 2003, Appellees filed a "Petition for Custody" in the Monroe County Court of Common Pleas, Juvenile Division, pursuant to R.C. § 2151.23(A)(2). The petition acknowledged that Michaelann and Matthew had never been convicted of any offense that resulted in a child being an abused or neglected child, nor had either of them engaged in conduct that resulted in a child being an abused or neglected child.
 {¶ 6} On April 19, 2003, after the initiation of these custody proceedings, Michaelann and Matthew were married. During the next few months, Matthew was asked to leave the residence more than once. Michaelann and Matthew expressed on the record no intention of getting a divorce, nor do they have specific plans to begin living together again.
 {¶ 7} The court appointed separate counsel for both Michaelann and Matthew, and appointed a guardian ad litem for the children.
 {¶ 8} The court held a custody hearing on December 5, 2003. Michaelann, Matthew and Appellees all testified. Other witnesses included former neighbors, a police officer who responded to a fire at Appellants' home, a guardian ad litem, a family doctor, and the maternal grandmother of the children. Appellees also attempted to have mental health professionals testify, but the trial court barred most of the testimony due to concerns about confidentiality.
 {¶ 9} There was considerable testimony about the volatile relationship between Matthew and Michaelann, about Michaelann's bipolar disorder, and about the fact that Michaelann changed her place of residence many times. On the other hand, there was overwhelming testimony that Michaelann was a capable and caring parent.
 {¶ 10} At the conclusion of the hearing, the court allowed the parties to submit proposed findings of fact and conclusions of law. The court rendered its judgment on December 31, 2003. The trial court adopted Appellees' proposed findings of fact, conclusions of law, and proposed judgment. The court also expanded upon the judgment proposed by Appellees by awarding visitation rights to the maternal grandparents, as well as ordering limited supervised visitation rights to Michaelann and Matthew.
 {¶ 11} This timely appeal was filed on January 15, 2004.
 {¶ 12} Appellants' sole assignment of error states:
 {¶ 13} "The trial court abused its discretion, committed reversible error and ruled against the manifest weight of the evidence when awarding custody of the minor children to their paternal grandparents as the evidence did not support the finding that the mother was unsuitable."
 {¶ 14} The trial court judgment now under review involves the issue of child custody. The basic standard of review of a trial court's decision regarding child custody is whether the court abused its discretion.Bechtol v. Bechtol (1990), 49 Ohio St.3d 21, 550 N.E.2d 178, syllabus. "A child-custody decision that is supported by a substantial amount of competent and credible evidence will not be reversed on appeal absent an abuse of discretion." Myers v. Myers, 153 Ohio App.3d 243,2003-Ohio-3552, 792 N.E.2d 770, ¶ 43. An abuse of discretion constitutes more than an error of law or judgment; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.
 {¶ 15} Appellants argue that this case is more specifically governed by the holding in Perales, supra, 52 Ohio St.2d 89, 369 N.E.2d 1047. InPerales, the natural parent signed an agreement shortly after her daughter was born to relinquish custody of the child to a nonparent. The child remained in the care and custody of the nonparent for over two years, when the mother filed a complaint to regain custody. The trial court granted custody to the nonparent based on its conclusion that it was in the best interests of the child. The Ohio Supreme Court reversed that decision and held that the best interests test was not the test to use in an original custody matter arising under the authority of R.C. §2151.23(A)(2). Perales held that:
 {¶ 16} "In an R.C. 2151.23(A)(2) child custody proceeding between a parent and a nonparent, the hearing officer may not award custody to the nonparent without first making a finding of parental unsuitability — that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child." Id. at syllabus.
 {¶ 17} Appellants cite the correct law governing this case, including the Perales case. Any consideration of procedures designed to terminate parental rights begins with the recognition of the unique sanctity that our culture and our law place on the parent/child relationship. In reSara H. (Dec. 16, 1994), 6th Dist. No. L-94-116. It is well recognized that the right to raise a child, "is an `essential' and `basic' civil right." In re Murray (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169, quoting Stanley v. Illinois (1972), 405 U.S. 645, 651, 92 S.Ct. 1208,31 L.Ed.2d 551. A parent's interest in the care, custody, and management of his or her child is "fundamental." Id.; see also Santosky v. Kramer
(1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599.
 {¶ 18} Although many of these principles arose in cases involving the permanent relinquishment of all parental rights, the same principles apply to other types of termination of parental rights, such as in the instant case where a nonparent is attempting to gain legal custody of a child. Inre Hockstok, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E. 971, ¶ 16-17. It is unclear why the dissent concludes that these principles do not apply to Appellants' situation. The fundamental parental right discussed in Stanley, Santosky, Hockstok, and a myriad of related cases, is the right to the care and custody of the child, which is the same right under review here. The dissent is simply in error when it concludes that we are holding the trial court to an artificially high standard of review.
 {¶ 19} Most recently, the United States Supreme Court emphasized the fundamental right of parents to make decisions concerning their children in Troxel v. Granville (2000), 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49.Troxel held that, "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." Id. at 68-69, 120 S.Ct. 2054,147 L.Ed.2d 49. The court also held that, "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a `better' decision could be made." Id. at 72-73, 120 S.Ct. 2054,147 L.Ed.2d 49. Although Troxel was reviewing the constitutionality of a statute dealing with the visitation rights of grandparents, its reasoning applies equally well to an attempt by grandparents to obtain complete legal custody of their grandchildren.
 {¶ 20} The complete termination of a parent's rights over the custody and care of his or her child has been described as, "`the family law equivalent of the death penalty in a criminal case.'" In re Hayes
(1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, quoting In re Smith
(1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45. "Therefore, parents `must be afforded every procedural and substantive protection the law allows.'" Id. Although this case involves something less than the permanent termination of all parental rights, Appellants' fundamental right to the care and custody of their children is squarely implicated by the trial court's decision, and Appellants should be able to rely on the procedural and substantive protections provided by law and arising from this fundamental right.
 {¶ 21} The Perales opinion, cited above, attempted to balance the interests of the parents and children by establishing the requirement that a court must find that a parent is unsuitable before the court would be permitted to award custody to a nonparent. Perales, supra,52 Ohio St.3d at 98, 369 N.E.2d 1047. One category of unsuitability is whether continued custody with the parent would be detrimental to the child. Id. A second category of unsuitability is whether the parent has become totally incapable of supporting or caring for the child. Id.
 {¶ 22} There is no dispute among the parties that this case originated as a custody proceeding pursuant to R.C. § 2151.23(A), which was also the statutory basis of the custody dispute under review in Perales. The trial court found two of the Perales factors in order to establish that Appellants were unsuitable parents. The trial court found that Michaelann was incapable of caring for the children, and that continued custody with Michaelann would be detrimental to the children. (12/31/2003 J.E., p. 5.) The trial court then specifically adjudicated Matthew and Michaelann to be unsuitable parents. (12/31/2003 J.E., p. 5.)
 {¶ 23} This appeal hinges on the testimony and other evidence presented at the custody hearing. Before reviewing this evidence in detail, it is important to note two things. First, we note that the trial court did not specifically find that Matthew satisfied any of the fourPerales factors prior to determining that he was an unsuitable parent. The fifth page of the trial court's judgment entry makes two findings only with respect to Michaelann, and then concluded that both parents were unsuitable. This may be a somewhat technical error, but Perales
itself was based on the technicality that the trial court failed to state on the record that the parents were unsuitable, even though the court had made the proper findings to support unsuitability.
 {¶ 24} The evidence also does not appear to support either of thePerales findings made by the trial court. There is no evidence at all to support the finding that Michaelann was incapable of caring for the children. One witness after another actually testified, whether wholeheartedly or reluctantly, that Michaelann was a fine parent and took care of all the basic needs of the children. Although Michaelann moved around many times, she always made sure the children had a roof over their heads. She was unemployed, but still received income from a variety of sources to pay her bills. Even during her bouts with depression and her bipolar disorder, she always managed to make sure the children had someone to take care of them.
 {¶ 25} The record is a bit more problematic with respect to the finding that continued custody with Michaelann would be detrimental to the children. Our review of the record does not reveal any direct evidence that Michaelann's parenting caused harm or detriment to the children. The trial court's finding can only be based on an inference of harm to the children. It should be kept in mind that an unsuitability determination based on detriment to the child must be measured in terms of the harmful effect on the child, and not in terms of society's judgment of the parents. Perales, supra, 52 Ohio St.2d at 98,369 N.E.2d 1047. Much of the evidence focused on Michaelann's bipolar disorder, her periodic need for hospitalization, her arguments with Matthew, and some of the choices she made based on her limited economic resources. Appellees' case was apparently based on painting a picture of Michaelann as a brawling, poverty stricken mental patient, rather than on any definable detriment to the children. Thus, we feel we must more closely look at the evidence that was presented at trial.
 {¶ 26} The evidence showed that Michaelann and Matthew are married but separated. Matthew voluntarily pays child support, even though it has never been requested by Michaelann. (Tr., p. 7.)
 {¶ 27} Michaelann has a GED diploma, and was unemployed at the time of the hearing. Michaelann had complete custodial responsibility for the children, which was fully supported by Matthew. Michaelann has been the primary caretaker of the boys since birth. (Tr., p. 117.) The record shows that even though Michaelann was unemployed she was not in dire financial straits, due to Matthew's child support payments, HUD support, and cash assistance from her parents. She also had applied for social security disability due to her bipolar disorder and other physical ailments. (Tr., pp. 7-8.)
 {¶ 28} Great emphasis was placed on the fact that Michaelann moved her place of residence many times in the five years prior to the custody hearing. (Tr., pp. 11-12.) She had lived in California for a short time, had several residences in Woodsfield, Ohio (including a home owned by her parents), and she resided in Bethesda, Cameron, Round Bottom, Wintersville, St. Clairsville (all in Ohio), and Moundsville and New Martinsville, West Virginia.
 {¶ 29} Michaelann once had a male visitor stay overnight while she and the children were at her parents' house. Michaelann, the visitor, and the children left the home after her parents got angry, and they walked in cold January weather across the New Martinsville bridge. (Tr., pp. 16-17.)
 {¶ 30} Michaelann allowed Appellees to have temporary custody of the children for two weeks in March of 2003. Michaelann visited the children every day, and took Elijah to the doctor when he contracted influenza. (Tr., p. 21.)
 {¶ 31} Appellees introduced into evidence a letter written by Michaelann in March of 2003 indicating that Appellees should take temporary custody of the children because her life was unstable at the time. (Tr., pp. 22-29.)
 {¶ 32} There was considerable testimony about the difficult and sometimes violent relationship that Michaelann and Matthew had. The evidence also showed that Michaelann had asked Matthew to leave two or three times, and that the two of them were separated at the time of the hearing. (Tr., pp. 29-30.)
 {¶ 33} During one of these arguments, Michaelann threw a brick at Matthew's car and was subsequently arrested for domestic violence. (Tr., pp. 34-35.) It is not clear whether the children were home at the time or if they saw the incident.
 {¶ 34} There were three disputes between Matthew and Michaelann in May, July, and August of 2003 that involved arguing, angry outbursts, and thrown objects. (Tr., p. 37.) The children were home during these arguments.
 {¶ 35} Appellees introduced a letter into evidence in which Michaelann apparently made a joke about possibly selling drugs. (Tr., p. 43.)
 {¶ 36} Appellees established that Michaelann took her daughter (at age eight) to a concert and did not return home until 2:30 a.m., and brought another girl home from the concert who needed a ride. (Tr., p. 45.)
 {¶ 37} Appellees spent a considerable amount of time establishing that Michaelann suffered from a bipolar disorder and took a number of medications to control it. (Tr., pp. 47f.) She also visits a doctor once a month for mental health purposes. (Tr., p. 48.)
 {¶ 38} The trial court permitted Appellees to introduce into evidence old letters that Michaelann had written in which she discusses her mental health problems. (Tr., p. 53.)
 {¶ 39} The record shows that Michaelann does not drink alcohol, but does smoke cigarettes. (Tr., pp. 59, 83.)
 {¶ 40} Michaelann testified that she had a cousin who was murdered. (Tr., p. 60.)
 {¶ 41} Michaelann was apparently charged once with child endangerment, but no evidence was admitted that she was convicted. (Tr., pp. 61, 63.)
 {¶ 42} Appellees established that Michaelann once left Gabriel in the house long enough to take another child to the end of the driveway to get on the school bus. (Tr., p. 65.)
 {¶ 43} Michaelann once burned one of Matthew's t-shirts once in anger. (Tr., p. 76.) She and Matthew would sometimes throw food or other objects during their fights. (Tr., p. 77.)
 {¶ 44} Michaelann once accidentally started a small fire in a laundry basket because she was using candles during a period when the electricity had been turned off. (Tr., pp. 80-81, 144.)
 {¶ 45} Michaelann kept pet cats and a rabbit, although she knew that Elijah had allergies. These pets were eventually removed. (Tr., p. 84.)
 {¶ 46} The evidence showed that Michaelann's parents help with the children, and contribute financially to raising them. (Tr., p. 86.) Michaelann and Matthew are very cooperative with each other in raising the children. (Tr., p. 87.)
 {¶ 47} Michaelann takes the two boys to the doctor and keeps track of their medical problems, such as asthma, Gabriel's foot problem at birth, and their tendency to become easily infected by colds. (Tr., pp. 89-92.)
 {¶ 48} The record reveals an ongoing animosity between Michaelann and Appellees. (Tr., p. 98.)
 {¶ 49} The record shows that Michaelann has the bills paid at her current residence, and that all the basic utilities are working. (Tr., p. 107.) Michaelann also has a functioning automobile. (Tr., p. 107.)
 {¶ 50} Michaelann testified that she decided to get some counseling for her children due to her ongoing problems with Matthew. (Tr., pp. 114-115.)
 {¶ 51} All the testimony shows that Michaelann has provided food, clothing, shelter, medical care, schooling, and recreation for her children.
 {¶ 52} Appellees called one of Michaelann's former neighbors, Margaret Buckalew, who testified that she twice saw the children outside during summer with no clothes on, although she could not specify what year she saw this happen. (Tr., pp. 130-131, 140.) Ms. Buckalew testified that nothing bad actually happened to the children during these incidents. (Tr., p. 140.)
 {¶ 53} Mike Young, assistant police chief of the Village of Woodsfield, testified that he responded to the report of a fire started by a candle at Michaelann's residence, and that the fire was out by the time he arrived. (Tr., p. 144.) He also testified that one of Michaelann's children once wandered away from home and walked down the road to a nearby carryout beverage distributor. (Tr., p. 146.) It is not clear from the record what happened after this incident.
 {¶ 54} The record also contains extensive evidence as to Matthew's behavior.
 {¶ 55} Matthew testified about the volatile relationship he had with Michaelann, including a number of break-ups in which he was asked to leave. He admitted that he was the cause of the problems much of the time. (Tr., p. 156.) He testified that they have thrown food at each other during their fights, and sometimes throw other objects. (Tr., pp. 157-158.) He testified that this was not a common occurrence. (Tr., p. 169.) Once, according to Matthew, he had to take a knife away from Michaelann during an argument. (Tr., p. 164.)
 {¶ 56} Matthew admitted kicking the headlight of Michaelann's car. He admitted using marijuana in the past. (Tr., p. 173.) He testified to a former drinking problem, and to having had treatment for drug and alcohol abuse. (Tr., pp. 174-175.) He also stated that he been hospitalized at one time for mental health reasons. (Tr., p. 175.)
 {¶ 57} The record reflects that Matthew was convicted of domestic violence in 1999. (Tr., p. 72.)
 {¶ 58} He testified that he took the children to his parents' house on Dec. 2, 2002, when Michaelann needed to go to the hospital for mental health reasons. (Tr., p. 177.) He stated that Michaelann twice had to go to the hospital for mental health issues. (Tr., p. 179.)
 {¶ 59} Matthew acknowledged that he had once actually encouraged his parents to file for custody, but later did not think it was proper. (Tr., pp. 180-181.) He stated that he may have made the suggestion in response to the fact that Michaelann had a boyfriend staying at her house at the time. (Tr., p. 181.)
 {¶ 60} Matthew testified that he and Michaelann have a very cooperative relationship in raising the children, and that it was his belief that Michaelann was a good mother. (Tr., pp. 186, 192.) He testified that he follows Michaelann's decisions on most aspects of raising the children, including discipline. (Tr., p. 196.) Matthew did not have anything negative to say about Michaelann in his testimony.
 {¶ 61} Matthew stated that he thought his children were normally very happy children, except for the problems caused by the custody dispute with his parents. (Tr., p. 193.)
 {¶ 62} Matthew acknowledged that he had an alcohol problem, and that this problem was the cause or aggravating circumstance of many of the arguments he had with Michaelann. (Tr., p. 191.) Matthew stated that he was trying to control his alcohol abuse, and was willing to be treated for it if necessary. (Tr., p. 205.) He also said that he attended court-ordered anger management classes, and then continued taking the classes on a voluntary basis afterward. (Tr., p. 204.) Matthew stated that he was willing to participate in any kind of counseling or program, including family counseling, in order to deal with his problems. (Tr., p. 205.)
 {¶ 63} Ms. Debra De Vitis testified as guardian ad litem for both children. She stated that she had been appointed as a guardian approximately eight times. (Tr., p. 238.) She did not have a college degree, although she took approximately two years' worth of classes at Columbia Junior College. (Tr., p. 274.) She stated that she also attended some seminars dealing with being a guardian ad litem. (Tr., p. 279.)
 {¶ 64} Ms. De Vitis stated that she witnessed a domestic dispute in which she had to separate Matthew and Michaelann. (Tr., p. 240.) The children were present during this incident. (Tr., p. 241.) She also believed that the children had witnessed other instances of domestic violence. (Tr., p. 242.) She stated that the children seemed "scared," "a little edgy," and "uncertain." (Tr., p. 242.)
 {¶ 65} Ms. De Vitis made contradictory statements about the effect of Michaelann's mental state on her parenting abilities. Ms. De Vitis stated that Michaelann's mental disorder, "does not make her unable to parent, for the most part[.]" (Tr., p. 243.) Yet, just a few sentences later, she stated that Michaelann's mental instability was detrimental to the children's welfare. (Tr., p. 244.) In later testimony she stated that, "the mental disability she had did not indicate that she could be a bad parent." (Tr., p. 259.)
 {¶ 66} Ms. De Vitis stated that the children told her that, "mom is a very good mom, she reads to me and she puts me in bed and she treats me good." (Tr., p. 246.) Ms. De Vitis thought these answers sounded rehearsed. (Tr., p. 246.)
 {¶ 67} Ms. De Vitis described Matthew and Michaelann's relationship, "not as much as violent but volatile, is a really — is probably a better term for that." (Tr., p. 249.) She noted that the problems occur when Michaelann and Matthew are living together, and then taper off when they separate. (Tr., p. 249.) Ms. De Vitis ultimately recommended that the children be removed from the custody of Matthew and Michaelann. (Tr., p. 250.)
 {¶ 68} Ms. De Vitis noted that the children were polite and had no particular behavioral problems. (Tr., p. 254.) She stated that she thought it was a good step that Michaelann and Matthew were separated and were sharing parental responsibilities. (Tr., p. 256.)
 {¶ 69} Ms. De Vitis recommended counseling for the entire family, including the grandparents, regardless of the ultimate custodial designation. (Tr., p. 260.) Ms. De Vitis ultimately concluded that continuing custody with the parents would be detrimental to the children. (Tr., p. 239.) She did not clarify whether she meant that custody would be detrimental only when both parents were present, or if it also applied to Michaelann's sole custody of the children. On cross-examination, she stated that her recommendations only related to her opinion concerning the best interests of the children. (Tr., pp. 279-280.) On cross-examination, Ms. De Vitis toned-down her observations considerably, and testified: "[b]ased on the information that I had received before, it isn't that they are bad parents in neglect of proper nutrition, or seeing that they have the proper clothing and that sort of thing, but just the volatile situation that occurs based on their relationship." (Tr., p. 284.)
 {¶ 70} Appellants called Dr. Geoffrey Snyder as a witness to testify about the health of the children. He stated that the children were generally healthy, well cared for, clean, well fed, and well behaved. (Tr., pp. 267-268.) He also testified that:
 {¶ 71} "Their general overall health is good. There are some medical conditions I do believe in the youngest child, Elijah, but they appear to be well compensated, and really, I've never seen any evidence that noncompliance issues or neglect or any other reversible or either intentioned or unintentioned actions on the part of the parents or anybody else has resulted in a worsening or inappropriate care of those conditions." (Tr., p. 268.)
 {¶ 72} Donna Keylor testified that Matthew and Michaelann have a very volatile relationship. (Tr., p. 299.) She estimated that Matthew and Michaelann had gone through 25 major breakups in the past six years. (Tr., p. 300.) She stated that from April 18, 2003, (the date that Matthew and Michaelann were married) until the time of the hearing in December, 2003, Appellants had four major fights in which Matthew had been kicked out of the house and returned to live at Appellees' home. (Tr., p. 300.) She described a major fight as one in which Matthew stayed at Appellees' home for one, two or three nights. (Tr., p. 301.)
 {¶ 73} Donna's knowledge of Appellants' relationship was related primarily through the recounting of hearsay statements from Matthew. One of the most curious stories she retold was the incident on July 4, 2003, in which Michaelann supposedly picked up a knife during an argument with Matthew. Donna claims that Matthew told her that Michaelann chased him around the house with a knife, and that he had to hold her down and restrain her in order to get the knife away from her. (Tr., p. 304.) Matthew then told her that, "[h]e was more upset that Elijah had thrown a chair at him, than he was the fact that he had to take a knife away from her." (Tr., p. 304.) Elijah was three years old at the time. It was Matthew's opinion, according to Donna's testimony, that Elijah threw the chair because he was upset about his mother being held down on the floor and the knife being taken away from her. (Tr., p. 305.)
 {¶ 74} Donna testified that she saw the aftermath of a fight that Appellants had in the winter of 1998-99, when Gabriel was about one year old. Donna went to Appellants' apartment and saw glass and debris on the stairs of the landing leading up to their second floor apartment. (Tr., p. 308.) When Donna went into the apartment, she did not find anything wrong with Gabriel or with Michaelann's other child, Emily, although she testified that the children were: "[I]n shock, you know. Gabriel was in a crib just standing there with just great big eyes, and Emily was in the bedroom with Gabriel." (Tr., p. 309.)
 {¶ 75} Donna testified that she sometimes saw food that had been thrown around in the apartment. (Tr., p. 310.) She stated, though, that she only tried to remove the children from the apartment one time. (Tr., p. 310.)
 {¶ 76} When Donna was asked whether she thought that Appellants' volatile relationship was affecting the children, she testified as follows:
 {¶ 77} "Gabriel has gotten very quiet. He's very guarded. He — we played these like learning your sounds, and you name names to go with different things, and if you say the wrong name, he goes, you know, it's like, you don't say Frank and you don't say Paul because he has an immediate reaction, and I didn't even think that these were actual people. I just, you know, they're average names. And you get a reaction from him.
 {¶ 78} "And Gabriel, when he's talking, sometimes he'll say, oh, I shouldn't have said that. And he's just kind of turning into a little bit of an introvert." (Tr., p. 313.)
 {¶ 79} Donna later admitted that Gabriel's guarded attitude might have something to do with the custody dispute between the child's parents and grandparents. (Tr., p. 333.)
 {¶ 80} Donna testified that the children are fairly clean when they come to visit, but that they are not always wearing appropriate clothing. (Tr., p. 315.) She stated that they were always well-fed and well-behaved, and always had a home to live in under Appellants' care. (Tr., p. 336.)
 {¶ 81} Donna testified that she did not think that Appellants were doing enough in response to Elijah's asthma. (Tr., p. 325.) She also stated that there was never a time when Appellants failed to include proper medications for the children when they were left at Appellees' home for visitation. (Tr., p. 347.) She further testified that she never considered that her own pet dogs had anything to do with Elijah's asthma. (Tr., p. 347.)
 {¶ 82} Donna stated that, according to Matthew, he was not able to care for the children by himself and did not want that responsibility. (Tr., p. 317.) She stated that Matthew "begged us to file" for custody of the children. (Tr., p. 318.) Donna admitted, though, that Matthew has changed his mind about Donna having custody. (Tr., p. 319.)
 {¶ 83} Donna further testified that Michaelann's mother wanted to get custody of Emily, and that she asked Donna to file for custody of Elijah and Gabriel in order to help with Emily's custody situation. (Tr., p. 319.)
 {¶ 84} Donna testified about an occasion in which she called Michaelann's home and Emily answered the phone. (Tr., p. 321.) Emily said that, "mommy went to the store," and that Gabriel was in bed sleeping. (Tr., p. 321.) Donna stayed on the phone until Michaelann returned. Michaelann told Donna she just ran across the street to get something, and, "she was sure that I did that when my kids were little." (Tr., p. 322.)
 {¶ 85} On cross-examination, Donna testified that she was employed full-time and was at work from noon until 9:00 p.m. from Monday through Friday. (Tr., p. 329.) If she was awarded custody of the children, she planned to have a babysitter take care of the children while she was at work. (Tr., p. 330.)
 {¶ 86} Donna testified that she and her husband have court-ordered visitation rights with Gabriel, and that Appellants voluntary send Elijah along during visitation. (Tr., p. 341.) Donna recalled two occasions when Appellants did not bring Gabriel for visitation at the proper time.
 {¶ 87} Appellants called former neighbor and longtime friend Jacklyn Gibson to testify. She stated that Elijah and Gabriel are the most well-behaved children that come to her home, that they eat well, have proper clothes, and carry on good conversations. (Tr., p. 372.)
 {¶ 88} Appellants called Dorothy Young to testify, who is Michaelann's mother. She testified that she sees the two boys almost every day, and that they are happy and healthy children. (Tr., p. 381.) She stated that the boys have completely different personalities from each other, but that both of them are very attached to their mother. (Tr., p. 384.) She testified that Michaelann was suitable to continue to be the primary caretaker and custodian of the two boys. (Tr., p. 387.) She testified that she did not give any verbal support of Appellees' plan to file for custody of the children. (Tr., p. 390.) Mrs. Young stated that she actually discouraged Appellees from attempting to gain custody. (Tr., p. 391.) She denied ever having made any suggestion that Appellees should attempt to gain custody of the boys in order to help her gain custody of Emily. (Tr., p. 391.)
 {¶ 89} Appellee Jack Keylor took the stand as the final witness. He testified that in January, 2003, he and his wife met for over an hour with Michaelann's parents, and during that meeting they were encouraged by Michaelann's parents to file for custody. (Tr., p. 399.) He believed that Mrs. Young was going to be a witness for them in the custody proceedings. (Tr., p. 400.)
 {¶ 90} Given the high standard that the trial court must meet in terminating Appellants' custody rights over their children, we cannot interpret the evidence in the record as supporting the trial court's decision to terminate custody in Michaelann. Appellees attempted to portray Michaelann as mentally unstable, poor, and prone to violent outbursts whenever Matthew was around for any length of time. Appellees did not try to prove that Michaelann was ever violent toward the children. Other than a few vague references about the two boys appearing to be a little quiet or reserved at times, as well as the guardian ad litem's unsupported conclusion the boys tended to give rehearsed answers, Appellees did not attempt to prove in any specific way how the boys were adversely affected by Michaelann's care. Appellees simply wanted the court to infer a detriment to the children by the fact that Michaelann was a socially unacceptable mother. As we noted earlier, custody decisions should not be based on whether the parents' behavior is socially acceptable, but rather, on whether there is harm to the children. Perales, supra, 52 Ohio St.3d at 98, 369 N.E.2d 1047.
 {¶ 91} The record does not support the trial court's finding of the type of detriment to the children contemplated by Perales, so as to render Michaelann as an unsuitable parent. Other cases that have found detriment or harm to the child have been based on serious problems with the conduct of the unsuitable parent toward the child. See, e.g., In reMedure, 7th Dist. No. 01 CO 03, 2002-Ohio-5035 (the children distrusted the parent, who was verbally and physically abusive toward them, including hitting them with ropes; the parent did not keep adequate supplies of food at home); In re Adams (Oct. 31, 2001), 9th Dist. No. 01CA0026 (the parent was incarcerated for three months after the child was born and was currently on probation in two counties; the parent had disorderly conduct charges pending against him; the parent had not paid child support for some time); Slivka v. Sealock (May 18, 2001), 5th Dist. No. 00-CA-13 (the parent made statements that she wanted the child back merely because she always wanted three children and that she would simply get pregnant again if the child was not returned to her; the parent had relinquished custody of the child for 24 months prior to the custody hearing; the parent had stopped having any contact with the child; the parent had a history of psychological and behavioral problems; the parent's husband had a domestic violence conviction);Reynolds v. Ross Cty. Children's Services Agency (1983), 5 Ohio St.3d 27,448 N.E.2d 816 (a psychologist and psychiatrist testified they believed the oldest child's allegations of sexual abuse by the parent, and that the children were afraid of being returned to the parent).
 {¶ 92} Much of the evidence offered in an attempt to prove Michaelann's unsuitability bordered on the absurd. Appellees attempted to establish that Michaelann once or twice might have let the boys run outside during the summertime without any clothes on when they were toddlers. Appellees tried to show that Michaelann sometimes took one of the boys down the street to a bus stop while the other one was sleeping. Michaelann once brought a girl home from a concert as a favor. She once left the boys alone long enough to run across the street to the grocery store. If these types of facts could seriously establish parental unsuitability, then the vast majority of parents in this state might be at risk of losing custody of their children.
 {¶ 93} There are a number of facts about Matthew and Michaelann's relationship, though, that are difficult to ignore. They throw things during their arguments, including, at least once, something made of glass which shattered on the stairs to their apartment. She damaged Matthew's car with a brick during one dispute, and once may have grabbed a knife while they were arguing. It is very interesting to note, though, that Matthew apparently was much more upset about Elijah attempting to stand up for Michaelann during the knife incident than he was concerned about the knife itself. And yet, despite these incidents, there was no indication that anyone had ever intervened because of a danger to the children.
 {¶ 94} It is clear from the record that Matthew does not want to have sole custody of the children, and is fully supportive of Michaelann continuing to have sole custody. There is no disagreement that Michaelann has been the custodial parent and primary caregiver for the two boys from the time they were born. There was general agreement that all the family members were in need of, or at least supportive of, counseling for all the family members involved in this custody dispute. What is not clear from the record is whether or not the trial court considered granting custody solely to Michaelann. There is also no indication in the record whether the court considered the impact of its decision on Emily, the other child under Michaelann's custody and care. Given these basic facts, and the important fundamental parental rights involved in this case, the trial court needed to place in the record whether Michaelann herself could retain custody with limited visitation rights for Matthew, contingent upon some type of ongoing family and marital counseling. Because it appears the trial court did not consider Michaelann's suitability as a separate entity from Matthew, even though the two do not live together, the trial court's decision is confusing in the light of the complete lack of any specific evidence that the children were harmed in any way by Michaelann's parenting choices.
 {¶ 95} Based on all these considerations, we conclude that the trial court abused its discretion by terminating Michaelann's fundamental right to the custody and care of her two boys, when it appears a less severe alternative presents itself on the record. Therefore, we find merit in Appellants' assignment of error. We reverse the judgment of the trial court and remand this case for further proceedings according to law and consistent with this Opinion.
Donofrio, P.J., concurs.
DeGenaro, J., dissents; see dissenting opinion.
DeGenaro, J., dissenting,
 {¶ 96} Although the majority and I agree that any procedure that affects a parent's constitutional custodial rights must be fundamentally fair, the majority uses a higher standard than is necessary when judging whether the trial court abused its discretion. The majority refers to the loss of legal custody as a "type of termination of parental rights." But this demonstrates a fundamental misunderstanding of the proceedings. When a court grants legal custody of a child to a non-parent, the parent's rights are not terminated; they retain residual parental rights and the ability to regain legal custody of their children. A parent's rights are only terminated when a court grants permanent custody of a child to either a public children services agency or a private child placing agency. This is simply not a case involving "the family law equivalent of the death penalty in a criminal case," Opinion at ¶ 20, and should not be treated as one. Because the facts support the trial court's determination that the Appellants are unsuitable parents, I must respectfully dissent.
 {¶ 97} The majority refers to this case as one involving "procedures designed to terminate parental rights," Opinion at ¶ 17, and describes this case as being "the family law equivalent of the death penalty in a criminal case." Opinion at ¶ 20. It criticizes me for not applying the same standard it is applying to this case, one involving a "type of termination of parental rights. Opinion at ¶ 18. It then determines that the trial court erred since the facts did not meet "the high standard [for] terminating Appellants' custody rights over their children." Opinion at ¶ 90. But the majority's central assumption, that this case involves the termination of any parental rights, is mistaken.
 {¶ 98} Ohio law allows courts to grant three different types of custody to nonparents: temporary custody, legal custody, and permanent custody. R.C. 2151.011(B)(46) defines "temporary custody" as "legal custody of a child who is removed from the child's home, which custody may be terminated at any time at the discretion of the court or, if the legal custody is granted in an agreement for temporary custody, by the person who executed the agreement." There is a built-in time limit to any award of temporary custody; it must terminate one year after the earlier of the date on which the complaint was filed or the date on which the child was first placed into shelter care. See R.C. 2151.353(F); Juv.R. 14(A).
 {¶ 99} In contrast, "`[l]egal custody' means a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C.2151.011(B)(19). A parent who loses legal custody of his or her child retains those rights, privileges, and responsibilities remaining with the natural parent after the transfer of legal custody of the child, including, but not necessarily limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support." R.C.2151.011(B)(45). A parent who loses legal custody of his or her child may also move to regain custody of the child, even after that parent has lost their children and been found to be an unsuitable parent. See In reHockstok, 91 Ohio St.3d 238, 2002-Ohio-7208, ¶ 42 (Pfeifer, J., dissenting); Shargo v. Gregory, 11th Dist. No. 2003-T-0058, 2004-Ohio-3512;Kenney v. Kenney, 12th Dist. No. CA2001-04-036, 2001-Ohio-8662; R.C.3109.04(E)(1)(a); In re Mears (June 21, 1996), 2nd Dist. No. 95 CA 116; R.C. 2151.23(F)(1); R.C. 2151.42.
 {¶ 100} Finally, "`[p]ermanent custody' means a legal status that vests in a public children services agency or a private child placing agency, all parental rights, duties, and obligations, including the right to consent to adoption, and divests the natural parents or adoptive parents of all parental rights, privileges, and obligations, including all residual rights and obligations." R.C. 2151.011(B)(30). An award of permanent custody "is the most drastic of the dispositions available" to a trial court because it divests a parent of all parental rights. In reHitchcock (1996), 120 Ohio App.3d 88, 101. A parent cannot regain custody of a child after a trial court has awarded permanent custody of that child to a public children services agency or a private child placing agency. It is the permanent nature of this loss of a fundamental right that makes it appropriate to equate an award of permanent custody to the death penalty in a criminal case. In re Hayes (1997),79 Ohio St.3d 46, 48; In re Smith (1991), 77 Ohio App.3d 1, 16.
 {¶ 101} Thus, the only type of custody award which terminates any parental rights is an award of permanent custody to a public children services agency or a private child placing agency. An award of legal custody does not terminate any parental rights. Rather, it limits those rights until the parent can successfully demonstrate to a court that they should regain custody of his or her children. If permanent custody is the family law equivalent of the death penalty in criminal cases, then legal custody is the equivalent of an indeterminate prison sentence. An award of legal custody to a non-parent is a serious matter which cannot be taken lightly. Thus, while an award of legal custody to a non-parent involves a parent's "fundamental liberty interest in the care, custody, and management of their children," In re Hockstok, 98 Ohio St.3d 238,2002-Ohio-7208, ¶ 16, it does not need to be judged by "the high standard [involved] in terminating Appellants' custody rights over their children," Opinion at ¶ 90, because the restraint placed upon that right is not as great as the severance of that right imposed by an award of permanent custody.
 {¶ 102} Of course, the majority does not apply the standards for permanent custody in this case since those standards do not apply. But it nevertheless imports those concepts into this case by its repeated citation to and reliance upon cases involving permanent custody. For example, no other Ohio court which has reviewed an award of legal custody to a non-parent has ever bothered mentioning that granting permanent custody of a child to a non-parent is the equivalent of the death penalty. No other Ohio court has ever referred to legal custody as the termination of any parental rights. No other Ohio court has referred to the test for unsuitability in a legal custody action between a parent and a non-parent set forth in In re Perales (1977), 52 Ohio St.2d 89, as a "high standard". References to the standards involved in awards of permanent custody are irrelevant in cases involving legal custody.
 {¶ 103} The test we must apply in this case is not more and no less than the one set forth in Perales; the trial court must find by a preponderance of the evidence that a parent is unsuitable. Id. at syllabus. A parent's rights when a trial court grants legal custody to a non-parent is protected by the test set forth in Perales. We do not need to amplify those protections by importing procedural rules and concepts from the caselaw dealing with the termination of parental rights.
 {¶ 104} In this case, the trial court made a factual finding that awarding custody of the children to Michealann would be detrimental to them. The trial court's decision must be affirmed if competent, credible evidence supports its factual finding. C.E. Morris Co. v. Foley Constr.Co. (1978), 54 Ohio St.2d 279. We cannot re-weigh that evidence and must defer to the findings of the trial judge who is best able to weigh credibility by viewing the witnesses and observing their demeanor.Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80. Given this standard of review, I cannot find that the trial court's decision that the parents are unsuitable is error.
 {¶ 105} In this case, the trial court found that the parents were unsuitable since awarding custody to either of the parents would be detrimental to the children. And Perales specifically named "detriment to the children" as one of the grounds for parental unsuitability in its syllabus. The evidence supports this conclusion.
 {¶ 106} The majority does a thorough job of reciting the evidence in this case and I need not do so again here. But the majority trivializes and minimizes the facts supporting the trial court's judgment. The facts supporting the trial court's judgment are not trivial and must be highlighted to demonstrate the reasonableness of its decision.
 {¶ 107} First, the majority calls it "absurd" to criticize the parents for letting the children run around outside without clothes on when they were toddlers. Opinion at ¶ 92. But the more important aspect of this testimony is not that the children were naked while outside; it is that they were unsupervised. And this is not the only time that Michealann left small children unsupervised. She herself testified that she would leave a small child at home alone on more than one occasion while she drove another one to a bus stop. And the children's grandmother testified that sometimes she called the family residence and the children were home alone while Michealann was shopping. This testimony demonstrates that Michealann has no problem leaving small children unsupervised.
 {¶ 108} The majority also fails to put much credence into the testimony establishing that the Michealann has failed to provide the children with a stable home. The family moved repeatedly during the past five years. Most of these moves would be necessitated by Michealann's failure to pay her utilities. When she would fail to pay her bills, she would move out of the home where the utilities had been shut off and into a shelter or other temporary housing where she would save money to get new housing. She would then fail to keep up with her utilities at the new home and would have to move into temporary housing again. Each of these moves would disrupt the children and many of them occurred in close succession.
 {¶ 109} Because of our standard of review, I would be troubled by the majority's conclusion that the trial court's finding that Michealann is unsuitable is in error, even if this were the only evidence of Michealann's unsuitability. But it is not. As significant as Michealann's inability to provide the children with a stable home and willingness to leave her small children home alone is her inability to provide the children with a stable emotional environment.
 {¶ 110} The record is replete with evidence that Michealann and Matthew have a tumultuous, volatile relationship. Each of them has been arrested for domestic violence committed against the other parent. In fact, Michealann was arrested for domestic violence against Matthew while this custody action was pending. The two have engaged in numerous violent arguments where objects and food have been thrown at each other. Sometimes these arguments are in the presence of the children and debris thrown at the other party hits the children. At other times, the children are in the next room, listening to the parents berate each other (In her testimony, Michealann attempts to distinguish fights where the children are in the same room from fights where they are in an adjoining room or watching the fight through a window, but I fail to see much difference between the two situations). And on at least one occasion, a child threw a chair at a parent while the parents were wrestling over control of a knife. After these fights, debris, such as broken glass, would litter the area.
 {¶ 111} Over the course of their relationship, Michealann and Matthew have broken up numerous times, yet they always get back together. Indeed, the parties had a long history of this pattern before they got married, which happened soon after the Appellees filed their petition for custody. Then Michealann kicked Matthew out of the family home three or four times during the eight months they were married prior to the hearing. And these were only the "major" fights. The two also had many minor fights during their short marriage which forced Matthew away from the family home. All the parties acknowledged that Matthew and Michealann's relationship will continue to be volatile in the future.
 {¶ 112} At the time of the hearing, both Matthew and Michealann testified that they had no plans to reunite in the near future, but they both also said they had no plans to divorce. Given evidence regarding the parties' history, the trial court could reasonably conclude that the two were likely to reunite at some point in the future and that their pattern of violent fights would continue.
 {¶ 113} In addition, Michealann has been diagnosed with bipolar disorder and hospitalized twice for psychiatric problems. In one document she wrote, she complained that she is "aggravated by everyone and anyone that I am around" and felt like she had "no control over her emotions." At the custody hearing, she admitted that her mental problems are detrimental to her children, but testified that the problems are better now that she is on new medication. The trial court was free to disbelieve Michealann's mitigating testimony, especially given the evidence of her violent, volatile behavior while this action was pending.
 {¶ 114} Finally, the Appellees testified that Michealann and Matthew asked them to initiate these proceedings. And in a letter Michealann wrote to the Appellees, she admitted "that things have been out of control for a long time" and that the children "can not live this way anymore."
 {¶ 115} None of this evidence, in isolation, may be enough to support the serious conclusion that awarding custody of the children to the parents would be detrimental to them. However, when this evidence is viewed as a whole, it clearly supports the trial court's decision. It's conclusion that Michealann is an unsuitable parent is supported by the evidence and the judgment of the trial court should be affirmed.